Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo CA 94402
(650) 781-0025
jake@blockleviton.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHING CHING CHENG, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>v.<br><br>ERASCA, INC., JONATHAN LIM, and DAVID CHACKO,<br><br>　　　Defendants. | Case No.　**'26 CV 3481 AJB JLB**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

- 1 -
CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff Ching Ching Cheng ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to Plaintiff, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendant Erasca, Inc. ("Erasca" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, and other publicly available information about Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, Erasca common stock during the period from January 14, 2025 through April 26, 2026, inclusive (the "Class Period"), who were damaged thereby (the "Class"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2. Erasca develops oncology therapies for patients with RAS/MAPK pathway-driven cancers. One of its primary drug candidates is ERAS-0015, a pan-RAS molecular glue targeting solid tumors.

3. Throughout the Class Period, Defendants made false and/or misleading statements, and failed to disclose material facts, including that: (1) ERAS-0015's preclinical data was based on improper comparisons to Revolution Medicines, Inc. ("RevMed") and placed Erasca at risk of violating patent and trade secret protections; and (2) based on the foregoing, Defendants lacked a reasonable basis for their positive statements related to ERAS-0015.

4. On April 27, 2026, at 8:31 a.m. EDT before the market opened, Erasca disclosed in a Form 8-K that it had received a letter from legal counsel for RevMed alleging that Erasca's ERAS-0015 infringes a RevMed patent (U.S. Patent No. 12,409,225) and is connected to alleged trade secret

- 2 -

misappropriation. RevMed also alleged that Erasca had "improperly compared preclinical data of ERAS-0015 and RMC-6236 in public disclosures" and demanded Erasca cease making "deceptive and untrue comparative statements comparing ERAS-0015 and RMC-6236." Erasca stated that it believes the assertions are without merit and intends to contest the allegations.

5. In response to this news, Erasca's stock price fell from a closing price of $21.49 on April 24, 2026 to open at $20.70 per share on April 27, 2026. Erasca's stock price continued to fall, closing at $19.15 on April 27, 2026.

6. Later, at about 4:17 p.m. EDT on April 27, 2026, Erasca filed a separate Form 8-K reporting preliminary Phase 1 clinical data for ERAS-0015 and disclosing that one patient that received 24 mg of ERAS-0015 had died approximately a month after starting ERAS-0015. The patient was classified as a "Grade 3 TRAE of pneumonitis" that "progressed to Grade 5 after withdrawal of supportive care per patient decision." Erasca further stated that comparisons between ERAS-0015 and other product candidates, including RMC-6236, were based on cross-study analyses and "not based on any head-to-head clinical trials," and that such comparisons are "inherently limited and such data may not be directly comparable."

7. In response to these revelations, the price of Erasca common stock declined more than 45% in premarket trading, from a closing price of $19.15 per share on April 27, 2026 to an opening price of $10.51 per share on April 28, 2026. The Company's stock continued to decline, closing at $9.90 per share on April 28, 2026.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

10.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

12.     In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the accompanying certification, which is incorporated by reference herein, purchased Erasca common stock during the Class Period and has been damaged thereby.

14.     Defendant Erasca, Inc. develops oncology drugs and is headquartered in San Diego, California. The Company's stock trades on the NASDAQ under the ticker symbol "ERAS."

15.     Defendant Jonathan Lim ("Lim") is the co-founder of Erasca and has served as Chief Executive Officer ("CEO") and Chairman of the Board of Erasca at all relevant times.

16.     Defendant David Chacko ("Chacko") has served as Chief Financial Officer ("CFO") and Chief Business Officer of Erasca at all relevant times.

17.     Collectively, Defendants Lim and Chacko are referred to throughout this complaint as the "Individual Defendants."

18.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected.  Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

19.    Erasca and the Individual Defendants are referred to herein, collectively, as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

20.    Erasca is a clinical-stage precision oncology company focused on discovering, developing, and commercializing therapies for patients with RAS/MAPK pathway-driven cancers.

21.    One of Erasca's primary drug candidates, ERAS-0015, is a pan-RAS molecular glue aimed at treating patients with RAS mutant solid tumors. This treatment would have broad implications in oncology because RAS mutations drive nearly one-fourth of all solid tumors, including in non-small cell lung cancer, pancreatic ductal adenocarcinoma, and colorectal cancer.

22.    In Erasca's Form 10-K filed with the SEC on March 20, 2025 ("2024 10-K"), Defendants advertised the vast market potential for ERAS-0015, stating it was a "potential best-in-class" drug that could have "the potential to address unmet medical needs in approximately 2.7 million patients who are diagnosed annually worldwide with RAS-mutant tumors[.]" Defendants also stated they approved a "reprioritization program" to focus substantial resources to ERAS-0015 and "deemphasize" certain of its other drug initiatives.

23.    Erasca's initial clinical trial for ERAS-0015 is called AURORAS-1. The investigational new drug application ("IND") for AURORAS-1 was cleared by the U.S. Food and Drug Administration ("FDA") in May 2025. Around the same time, Erasca began touting ERAS-0015's potential compared to RevMed's RMC-6236, including detailed statements comparing preclinical results in the 2024 10-K.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

24. Later, on January 12, 2026, Erasca provided an update regarding the initial clinical progress of ERAS-0015 in a presentation filed on Form 8-K with the SEC. In the presentation, Erasca again provided a detailed comparison of ERAS-0015 to RMC-6236, including multiple slides highlighting the superior potential of ERAS-0015 titled, "ERAS-0015's higher CYPA binding affinity may be a differentiator from RMC-6236, demonstrating potential best-in-class profile[,]" "ERAS-0015 demonstrated significantly more potent inhibition of cell growth across KRAS mutant cell lines vs. RMC-6236[,]" "ERAS-0015 demonstrated comparable antitumor activity to RMC-6236 at 1/10th of the dose in a sensitive KRAS G12D PDAC CDX model[,]" "ERAS-0015 demonstrated comparable antitumor activity to RMC-6236 at 1/10th of the dose in an insensitive KRAS G12V NSCLC CDX model[,]" "ERAS-0015 demonstrated preferential tumor distribution and longer residence time vs. RMC-6236 in vivo[,]" and "ERAS-0015 showed promising PK in mouse, rat, dog, and monkey" in comparison to RMC-6236.

25. As a result of these and other materially false and misleading statements, investors were unaware that Defendants' comparisons to RMC-6236 were false and Erasca was at significant risk of patent and trade secret challenges by RevMed. Defendants' comparisons touting ERAS-0015's preclinical superiority also misled investors about its true risks and prospects.

## DEFENDANTS' MATERIALLY FALSE AND
## MISLEADING STATEMENTS AND OMISSIONS

26. The Class Period starts on January 14, 2025, when Erasca presented at the Annual J.P. Morgan Healthcare Conference. At the conference, Defendant Lim advertised ERAS-0015 and compared it to RMC-6236, stating:

So starting with 15. ***This is a potential best-in-class pan-RAS molecular glue. So it basically binds cyclophilin A or CYPA and forms a tripartite moiety, very similar to Revolution Medicines RMC-6236***. And Rev Med has done a great job blazing the trail, but we're very excited about ERAS-15 and its preclinical properties to date. So in vitro, you can see it has low sub-nanomolar to low nanomolar IC50 across multiple

mutations, including wild-type. In vivo, what's particularly impressive is the incredibly low doses by which tumor regression is observed.

So doses as low as 0.3 to 5 milligrams per kilogram PO on a daily basis. The oral bioavailability is very high across small and large animal species. *IP is strong with exclusivity expected through 2043 and no patentability roadblocks identified to date.*

27.     At the same conference, an analyst from J.P. Morgan asked Lim "to comment a little bit about ERAS-0015. And what you kind of learned from the evolving competitive landscape from Revolution Medicines and others." In response, Lim stated:

Yes. So I think what's interesting is that the scientific bar for working on a pan-RAS molecular glue is very high. So it's really hard -- much harder to discover and develop a pan-RAS molecular glue than it is – there's many more pan-KRAS small molecules out there. So I think there's sort of a scarcity issue within this class. *So Rev Med clearly is the trailblazer in this space. I think we've learned a lot from their clinical data in terms of PDAC as well as more recently non-small cell lung cancer.*

I think other tumor types will be interesting to see. But being second in an area of high unmet need across PDAC, lung and other tumor types is a good place to be. There's one other company in China that has a pan-RAS molecular glue. They are further behind. *And also based on the preclinical data we've seen, it looks to have a profile, not too dissimilar from 6236 at this point, but it's still early days.*

*I think -- yes, so I think we've learned mostly from RMC-6236 in terms of clinical data for PDAC and lung.* The PDAC data, in particular, very exciting in terms of the ability to help patients, and we'll be following them as well as once we start generating our own data, later this year, I think we'll be right there.

28.     On March 20, 2025, Erasca filed its Annual Report on Form 10-K with the SEC reporting on its financial results for its fiscal year ended December 31, 2024 (the "2024 10-K"). In the 2024 10-K, Defendants stated:

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

ERAS-0015 is a pan-RAS molecular glue that we believe has the potential to treat patients with RAS mutant solid tumors. The molecule forms a tripartite complex with Cyclophilin A (CypA) and the active form of RAS to inhibit RAS-dependent signaling. In surface plasmon residence (SPR) and isothermal titration calorimetry (ITC) binding assays, **ERAS-0015 has demonstrated 8-21-fold higher binding affinity to cyclophilin A relative to RMC-6236 (the leading pan-RAS molecular glue in development), which we believe may enable more potent inhibition**.

| Assay | ERAS-0015 (nM) | RMC-6236 (nM) | Binding affinity difference: ERAS-0015/ RMC-6236 |
|---|---|---|---|
| SPR $K_D$ | 4.5 | 92 | 21x |
| ITC $K_D$ | 5.3 | 44.1 | 8x |

We performed a tumor PK distribution assessment in TGI studies of ERAS-0015 versus RMC-6236 in PK-59 and PSN-1 CDX models. PK concentrations of paired tumor and blood samples were measured at 4 and 24 hours after the last dose of the TGI studies.

**In the PK-59 CDX study, the dose normalized ERAS-0015 (across 3 ERAS-0015 dose levels: 0.1, 0.3, and 1 milligrams per kilograms (mpk)) tumor PK exposures relative to the corresponding blood concentrations at 4 and 24 hours post-dose were much higher compared to the same measure for RMC-6236 (dose normalized for 2 RMC-6236 dose levels: 1 and 3 mpk), indicating preferential tumor distribution for ERAS-0015. In addition, the decrease in ERAS-0015 tumor concentrations from 4 to 24 hours post-dose was much smaller compared to that of RMC-6236, suggesting longer tumor residence time for ERAS-0015.**

Similar findings were also observed in the PSN-1 CDX study as shown in the figure on the right. (In the PSN-1 model, ERAS-0015 exposures were dose normalized across 0.3 and 1 mpk; RMC-6236 exposures were dose normalized across 3 and 10 mpk).

- 8 -

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*Taken together, these data demonstrated that ERAS-0015 showed preferential tumor distribution and longer residence time relative to RMC-6236, which we believe may help drive antitumor activity.* We believe that the preferential tumor distribution and longer residence time could be related to the higher CypA binding affinity.





CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Preclinical potency of ERAS-0015

In multiple in vitro cell lines containing representative mutations in KRAS G12X, Q61R, and G13D as well as KRAS wildtype, ***ERAS-0015 showed superior in vitro potency when compared to RMC-6236 with an average of 5 times greater potency***. The molecule showed subnanomolar to nanomolar potency against KRAS G12X, G13D, and KRAS wildtype and was also active against HRAS and NRAS. ERAS-0015 showed no activity in the BRAF V600E A375 cell line, demonstrating selective inhibition of RAS.

| Mutation | Tumor type | Cell line | ERAS-0015 cell growth inhibition (nM) | RMC-6236 cell growth inhibition (nM) | ERAS-0015:RMC-6236 Fold Potency |
|---|---|---|---|---|---|
| KRAS G12C | NSCLC | H358 (adagrasib-resistant) | 0.8 | 3.6 | 4.5x |
| | NSCLC | LU99 | 1.4 | 5.4 | 3.9x |
| KRAS G12D | NSCLC | A-427 | 13.3 | 59.2 | 4.5x |
| | CRC | SW620 | 0.2 | 1.3 | 6.5x |
| | CRC | GP2d | 0.9 | 4.6 | 5.1x |
| | PDAC | AsPc-1 | 2.0 | 26.7 | 13.4x |
| | PDAC | HPAC | 4.8 | 15.5 | 3.2x |
| | PDAC | PK-59 | 10.7 | 10.7 | 1x |
| | PDAC | KP-4 | 5.0 | 19.7 | 3.9x |
| | PDAC | Panc 04.03 | 5.7 | 26.4 | 4.6x |
| KRAS G12V | Lung Cancer | NCI-H727 | 0.4 | 1.7 | 4.3x |
| | Lung Cancer | NCI-H441 | 1.4 | 16.7 | 11.9x |
| | CRC | SW480 | 0.8 | 6.8 | 8.5x |
| | PDAC | CAPAN-1 | 2.5 | 7.1 | 2.8x |
| | Ovarian leiomyosarcoma | RKN | 0.7 | 1.6 | 2.3x |
| KRAS G12R | PDAC | PSN-1 | 5.3 | 17.1 | 3.2x |
| KRAS G12S | NSCLC | A-549 | 4.1 | 38.3 | 9.3x |
| KRAS Q61R | PDAC | Panc 02.13 | 7.4 | 44.3 | 6x |
| KRAS G13D | CRC | LoVo | 2.8 | 1.5 | 0.5x |
| | CRC | HCT-116 | 5.5 | 26.2 | 4.8x |
| KRAS WT Amplified | Gastric | MKN-1 | 13.8 | 55.8 | 4x |
| EGFR L858R / T790M | NSCLC | H1975 | 6.5 | 11.4 | 1.8x |
| MET amplified | NSCLC | EBC-1 | 4.4 | 16.9 | 3.8x |
| BRAF V600E | Melanoma | A375 | >6,000 | >6,000 | N/A |

Preclinical efficacy of ERAS-0015

In vivo, ERAS-0015 achieved tumor regression in multiple CDX models across PDAC, CRC, and NSCLC tumor types at doses as low as 0.3 to 0.5 mpk. ***Potentially due to its greater binding affinity to CypA than RMC-6236, ERAS-0015 demonstrated comparable to greater in vivo antitumor activity at doses which were approximately one-tenth to one-eighth of the dose of RMC-6236.***

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

For example, in the PK-59 KRAS G12D PDAC model, the tumor regression that was observed with RMC-6236 at 3 mpk was comparable to the regression that was observed with ERAS-0015 at 0.3 mpk. This difference in in vivo antitumor activity was observed across multiple CDX models including KRAS G12R PDAC CDX PSN-1 and KRAS G12V CRC CDX SW620.

| Model and TGI Measurement Day | ERAS-0015 Dose (mg/kg QD) | ERAS-0015 TGI | RMC-6236 Dose (mg/kg QD) | RMC-6236 TGI | TGI Ratio |
|---|---|---|---|---|---|
| PK-59 Day 23 (KRAS G12D PDAC) | 0.3 | 106% | 3 | 105% | ~10 |
| PSN-1 Day 14 (KRAS G12R PDAC) | 1 | 97% | 10 | 95% | ~10 |
| SW620 Day 26 (KRAS G12V CRC) | 3 | 102% | 25 | 103% | ~8 |
| NCI-H727 Day 22 (KRAS G12V NSCLC) | 1 | 104% | 10 | 104% | ~10 |

This difference in in vivo antitumor activity was also observed in the NCI-H727 KRAS G12V NSCLC CDX model. ***ERAS-0015 was able to achieve tumor regression at 1 mpk relative to RMC-6236 at 10 mpk.***



- ERAS-0015 achieved comparable tumor regression to RMC-6236 in this model at 1/10th the dose at 1 mg/kg p.o. QD
- ERAS-0015 was well tolerated at all doses

Activity was also observed with the combination of ERAS-0015 and anti-PD-1 therapy in a KPC KRAS G12D CDX model where tumor regression was maintained even after treatment was stopped on Day 31. Furthermore, tumors did not form after a rechallenge with tumor cells, which involved injecting the tumor cells in the

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

contralateral side of the animal without administering any drug therapy. These rechallenge data suggest that the combination of ERAS-0015 and anti-PD-1 can stimulate immunologic antitumor memory in the rechallenged mouse. Doses administered were tolerable as measured by body weight change.

 

- ERAS-0015 in combination with anti-PD-1 therapy resulted in a sustained complete response in 7 out of 7 treated mice starting on day 31
- ERAS-0015 as a monotherapy and in combination with an anti-PD-1 was well tolerated
- Monotherapy treatments stopped on study day 26 and combination treatment stopped on study day 38
- Tumor formation was not observed up to 60 days after KPC rechallenge (KPC tumor cells were reinoculated on day 79)

p.o.: orally administered; BIW: twice a week; BID: twice a day; QD: once daily; CDX: cell line-derived xenograft; TGI: tumor growth inhibition

Pharmacokinetics and ADME of ERAS-0015

ERAS-0015 has shown encouraging PK results in multiple species, including mouse, rat, dog, and monkey. ***In a head-to-head comparison of ERAS-0015 and RMC-6236, ERAS-0015 outperformed RMC-6236 on three key metrics (specifically, lower clearance, longer half-life, and higher bioavailability demonstrated across all species tested) that we believe may provide ERAS-0015 a clinical advantage in the clinic over RMC-6236.***

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

| | | Mouse | | Rat | | Dog | | Monkey | |
|---|---|---|---|---|---|---|---|---|---|
| | | ERAS-0015 | RMC-6236 | ERAS-0015 | RMC-6236 | ERAS-0015 | RMC-6236 | ERAS-0015 | RMC-6236 |
| IV | Dose (mpk) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | No Data |
| | $T_{1/2}$ (h) | 5.0 | 1.7 | 5.7 | 1.5 | 24.5 | 7.6 | 15.2 | No Data |
| | $Vd_{ss}$ (L/kg) | 5.3 | 1.9 | 1.9 | 1.9 | 3.8 | 3.7 | 1.8 | No Data |
| | Cl (mL/Kg/min) | 12.8 | 15.6 | 4.6 | 19.2 | 1.9 | 7.9 | 1.6 | No Data |
| | $AUC_{0-last}$ (nM*h) | 1,337 | 1,274 | 4,125 | 1,123 | 7,910 | 2,630 | 11,479 | No Data |
| Oral | Dose (mpk) | 10 | 10 | 10 | 10 | 5 | 5 | 5 | No Data |
| | $C_{max}$ (nM) | 745 | 1,443 | 1,620 | 339 | 472 | 377 | 723 | No Data |
| | $T_{1/2}$ (h) | 6.3 | 1 | 6.1 | 2.5 | 22.4 | 7.8 | 12.3 | No Data |
| | $AUC_{0-last}$ | 6,786 | 4,467 | 15,213 | 1,427 | 8,720 | 2,755 | 10,004 | No Data |
| | Bioavailability (F %) | 48% | 33% | 38% | 14% | 22% | 21% | 17% | No Data |

ERAS-0015 has shown favorable overall ADME properties in vitro and encouraging PK characteristics in in vivo animal studies that we believe support development in clinic. *Based on the differentiated potency and PK/ADME results, we predict that ERAS-0015 will be efficacious at lower doses than the leading pan-RAS molecular glue in development, which may lower the risk of solubility-limited absorption issues and enable linear PK exposure relative to the leading pan-RAS molecular glue in development. In addition, the hERG IC50 was greater than 10 micromolar which suggests potentially lower concern for cardiovascular risk.*

29.     On January 12, 2026, Erasca provided an update regarding the initial clinical progress of ERAS-0015 in a presentation filed on Form 8-K with the SEC. In the presentation, Erasca included multiple slides touting the superior potential of ERAS-0015 compared to RMC-6236, with slides highlighting preclinical data titled, "*ERAS-0015's higher CYPA binding affinity may be a differentiator from RMC-6236, demonstrating potential best-in-class profile*[,]" "*ERAS-0015 demonstrated significantly more potent inhibition of cell growth across KRAS mutant cell lines vs. RMC-6236*[,]" "*ERAS-0015 demonstrated comparable antitumor activity to RMC-6236 at 1/10th of the dose in a sensitive KRAS G12D PDAC CDX model*[,]" "*ERAS-0015 demonstrated comparable antitumor activity to RMC-6236 at 1/10th of the dose in an insensitive KRAS G12V*

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*NSCLC CDX model*[,]" "*ERAS-0015 demonstrated preferential tumor distribution and longer residence time vs. RMC-6236 in vivo*[,]" and "*ERAS-0015 showed promising PK in mouse, rat, dog, and monkey*" in comparison to RMC-6236.

30.     On January 13, 2026, Erasca again presented at the Annual J.P. Morgan Healthcare Conference, which was attended by Lim and Chacko. At the conference, Lim stated:

So I'm going to start with a deep dive on ERAS-0015. *This is the potential best-in-class pan-RAS molecular glue*, and I'll also update you on the clinical update that we shared earlier this week*. So ERAS-0015's potential differentiation really stems from the high binding affinity to cyclophilin A or CypA. And so this works by a similar molecular glue mechanism where this has about 8 to 21-fold higher binding affinity to CypA versus RMC-6236.* And as a result of that, you just get many more of these bipartite moieties.

So if you have 0015 with CypA, that bipartite moiety, we call it a Pacman molecule goes hunting for RAS to form a tripartite or ternary complex that then takes RAS out of circulation. And so by having the higher binding affinity, you just have a lot more -- this is a nod to all of you who grew up in the '80s, but pan-RAS Pacman molecules that just take RAS out of circulation. Now what does that mean? *Well, it results in better potency across multiple cell lines. You can see various degrees of full potency versus 6236 against different mutations of interest across the spectrum of KRAS and other drivers.*

And you could see sparing of RTK-altered cell lines. *And importantly, in vivo, we're seeing ERAS-0015 demonstrating comparable antitumor activity to RMC-6236 at just 1/10 of the dose.* And so I'm going to show you on this slide, a sensitive KRAS G12D pancreatic model, where you could see it's called PK59. *6236 was able to achieve very good tumor regression with 3 mpk. And what's really impressive is that ERAS-0015 was able to achieve the same degree of tumor regression with 0.3 mpk*

- 14 -

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*or 1/10 of the dose. So that just gives you a sense of how potent both of these molecules are, but 6236 in this comparison requires 10x the dose.*

On this insensitive model, KRAS G12V non-small cell lung cancer, this is a model called NCI-H727. In the industry, amongst academia, especially, this is widely viewed as a bellwether model of sorts because it's where you have – it's very difficult to see tumor regression with pan-KRAS molecules in this type of model, but you could see that 6236 was able to achieve good tumor regression with 10 mpk. *And also impressively, ERAS-0015 was able to achieve that with just 1 mpk. So again, the 1/10 of the dose in an insensitive model.*

So we have a lot of other models that we've shared. They are in the public domain, so I encourage you to view our prior presentation. So we won't walk you through the half dozen or so other models. *But importantly, from a PK perspective, the kinetics of ERAS-0015 also look very promising. So if you look at the tumor distribution and residence time, 15 does look like it has preferential tumor distribution and longer residence time.* So if you focus on the graphs on the left, this is the same PK59 model, that sensitive PDAC model that I just mentioned a couple of slides prior.

So if you look at the light blue bars for ERAS-0015 versus RMC-6236, you could see that the levels of both drugs go down pretty substantially from 4 to 24 hours. *But if you look at the medium to dark blue bars, you could see that 6236 diminishes or decreases over that 24-hour period, but ERAS-0015 levels are sustainably high.*

*And so what that tells us is that -- well, the reason for that is that there is a CypA that's overexpressed in multiple solid tumor types. And because of the higher binding affinity of ERAS-0015 to CypA, it's just lingering in the tumor and surrounding tissues a little longer. And so that tumor distribution and residence time, if that translates -- well, certainly, the PK kinetics look preferential in that case. But if that translates into a safety or efficacy advantage, then that will be really*

- 15 -

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*cool to see. And then that's not just one model, but it's also seen in another model called PSN1 on the right.*

From a PK perspective, ERAS-0015 showed promising PK across multiple small and large animal species. So I'll draw your attention to the boxed areas. Clearance-wise, *ERAS-0015 had lower clearance across the board relative to 6236, longer half-life and a higher oral bioavailability* as expressed by F percent.

31.    During the same conference, Lim also stated:

So I know that Anupam is going to ask me about all the different doses that were evaluated in this trial. *We will disclose all of that in the first half of this year. So top line safety, tolerability, PK and initial efficacy data for dozens of patients are planned for this first half. But in the meantime, based on the early signs of activity as well as safety and tolerability and PK, we think 15 has the potential to become a preferred RAS targeting backbone for combinations*.

32.    On March 12, 2026, Erasca filed its Annual Report on Form 10-K with the SEC reporting on its financial results for its fiscal year ended December 31, 2025 (the "2025 10-K"). In the 2025 10-K, Defendants repeated the same preclinical data alleged herein in ¶28, comparing ERAS-0015 to RMC-6236.

33.    In the 2025 10-K, Defendants also stated, "On January 12, 2026, we provided an update regarding the initial clinical progress of ERAS-0015. The update consisted of the following, as of a data cutoff of January 7, 2026…*Favorable safety and tolerability results, with no dose-limiting toxicities and predominantly low-grade adverse events observed at all dose levels evaluated*[.]"

34.    The statements referenced above in ¶¶26-33 were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, which were known to Defendants or recklessly disregarded by them as follows:

- 16 -

a)      ERAS-0015's preclinical data was based on improper comparisons to Revolution Medicines ("RevMed") and placed Erasca at risk of violating patent and trade secret protections; and

b)      that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's business, operations, and prospects related to ERAS-0015.

### ADDITIONAL SCIENTER ALLEGATIONS

35.      As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Erasca's common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Erasca, their control over, and/or receipt or modification of, the Company's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Erasca, participated in the fraudulent scheme alleged herein. The adverse events at issue also involved one of the Company's main drug programs.

36.      Defendants capitalized on Erasca's artificially inflated stock price to conduct a common stock offering that closed on January 23, 2026, pursuant to a shelf registration statement on Form S-3, including a base prospectus, that was previously filed with the SEC and declared effective on August 22, 2025. Erasca represented that its gross proceeds from the offering, before deducting the underwriting discounts and commissions and other offering expenses, were approximately $258.8 million. Defendants were motivated to artificially inflate Erasca's stock price for this purpose, and the timing of the offering in relation to Defendants' misstatements and omissions about ERAS-0015 further support a strong inference of scienter.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

37. As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## LOSS CAUSATION/ECONOMIC LOSS

38. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

39. On April 27, 2026, at 8:31 a.m. EDT before the market opened, Erasca disclosed that it received a letter from RevMed alleging that Erasca's ERAS-0015 infringes a RevMed patent and is connected to alleged trade secret misappropriation. In response to this news, Erasca's stock price fell from a closing price of $21.49 on April 24, 2026 to open at $20.70 per share on April 27, 2026. Erasca's stock price continued to fall, closing at $19.15 on April 27, 2026.

40. Later, at about 4:17 p.m. EDT on April 27, 2026, Erasca filed a separate Form 8-K reporting preliminary Phase 1 clinical data for ERAS-0015 and disclosing that one patient that received 24 mg of ERAS-0015 had died approximately a month after starting ERAS-0015. The patient was classified as a "Grade 3 TRAE of pneumonitis" that "progressed to Grade 5 after withdrawal of supportive care per patient decision." Erasca further stated that comparisons between ERAS-0015 and other product candidates, including RMC-6236, were based on cross-study analyses and "not based on any head-to-head clinical trials," and that such comparisons are "inherently limited and such data may not be directly comparable."

41. In response to these revelations, the price of Erasca common stock declined more than 45% in premarket trading, from a closing price of $19.15 per share on April 27, 2026 to an opening price of $10.51 per share on April 28, 2026. The Company's stock continued to decline, closing at $9.90 per share on April 28, 2026.

42. The decline in Erasca's stock price is directly attributable to the announcements about ERAS-0015.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**

**FRAUD-ON-THE-MARKET DOCTRINE**

43. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

    a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b) The omissions and misrepresentations were material;

    c) The Company's common stock traded in efficient markets;

    d) The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

    e) Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

44. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

**NO SAFE HARBOR**

45. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

46.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Erasca common stock from January 14, 2025 through April 26, 2026, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

49.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a)  Whether Defendants violated the Exchange Act;

b)  Whether Defendants omitted and/or misrepresented material facts;

c)  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d)  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e)  Whether the price of the Company's stock was artificially inflated; and

f)  The extent of damage sustained by Class members and the appropriate measure of damages.

- 20 -

50. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

51. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

52. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I
### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

53. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

56. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

- 21 -

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## COUNT II
### For Violation of §20(a) of the Exchange Act
### (Against the Individual Defendants)

57. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58. The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C. Awarding Plaintiff and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

D.      Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

June 10, 2026                                         Respectfully submitted,

                                                     */s/ Jacob A. Walker*
                                                     Jacob A. Walker (SBN 271217)
                                                     **BLOCK & LEVITON LLP**
                                                     400 Concar Drive
                                                     San Mateo CA 94402
                                                     (650) 781-0025
                                                     jake@blockleviton.com

                                                     *Counsel for Plaintiff*

- 23 -

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS